UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

ROBERT CLIFFORD WEDDINGTON,

   Plaintiff,

v.

PRIMECARE MEDICAL, INC.,
MED. DIR. ZOWIE BARNES, M.D.,
JOHNS HOPKINS WILMER EYE INST.,
DR. NARINE VIRUNI, M.D.,
DAVID CLARK GRITZ, M.D. M.P.H, and
ISHRAT AHMED,

   Defendants.

Civil Action No. TDC-19-2175

## MEMORANDUM OPINION

Plaintiff Robert Clifford Weddington, an inmate confined at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland, has filed a civil action against Defendants PrimeCare Medical, Inc. ("PrimeCare"), Johns Hopkins Wilmer Eye Institute ("Wilmer Eye Institute"), Dr. Zowie Barnes, Dr. Narine Viruni, Dr. David Clark Gritz, and Dr. Ishrat Ahmed, which the Court construes as alleging negligence and a claim under 42 U.S.C. § 1983 for the denial of adequate medical care in violation of the Eighth Amendment to the United States Constitution arising from his treatment for an eye injury he incurred while he was confined at the Baltimore County Detention Center ("BCDC"). Defendants PrimeCare and Dr. Zowie Barnes (collectively, "the PrimeCare Defendants") have filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. The remaining Defendants have not been served. Upon review of the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For

the reasons set forth below, the PrimeCare Defendants' Motion will be GRANTED, and the Amended Complaint will be DISMISSED as to the unserved Defendants.

## BACKGROUND

### I. Medical Treatment

On April 12, 2016, Weddington was injured during a basketball game at BCDC when another inmate's finger went into his left eye. Weddington received treatment at Wilmer Eye Institute and was then transferred to the Western Correctional Institution in Cumberland, Maryland. At some later point, he was returned to BCDC.

On August 29, 2017, after arriving back at BCDC, Weddington began having problems with his left eye again. According to Weddington, when he submitted sick call requests to be seen for the problem, medical staff sought to fit him for glasses and referred him for a consultation with an ophthalmologist. On September 16, 2017, Dr. Barnes, a physician at BCDC employed by PrimeCare, examined Weddington for the first time. On that occasion, Weddington had, among other conditions, a recurrent corneal abrasion. By September 25, 2017, the corneal abrasion was treated with erythromycin ointment. On September 26, 2017, medical staff requested an eye evaluation for Weddington. On October 15, 2017, Weddington was evaluated by an optometrist and also received artificial-tears eyedrops. Dr. Barnes asked for and received permission for Weddington to keep the ointment and eyedrops with him to facilitate treatment of his eye. These treatments were prescribed for a six-month period. During the remainder of 2017, although Weddington had several medical appointments, he did not identify additional concerns relating to his eye.

On August 5, 2018, Weddington came to the BCDC medical unit complaining of drainage from his left eye. Weddington reported that the ointment and eyedrops had not successfully

2

resolved his eye problem and that he had "clear, gooey drainage" from his eye and blurry vision. Med. Records at 28, Mot. Dismiss, Ex. A, ECF No. 22-2. At that time, the treating nurse practitioner concluded that Weddington had allergic conjunctivitis and referred him to an in-house ophthalmologist. During a visit two days later, on August 7, 2018, the ophthalmologist dilated Weddington's eyes as part of the examination and prescribed antibiotic eyedrops. On August 10, 2018, Weddington reported that he continued to have problems with his left eye and requested to see an eye doctor.

The following day, August 11, Weddington complained that he could only see white when he opened his left eye and that his eye was painful and tearing. The medical provider noted that Weddington's left eye was severely infected. The same day, Weddington was seen by a doctor at Johns Hopkins Hospital Emergency Services, who diagnosed a corneal abrasion in his left eye, prescribed cyclopentolate 1% ophthalmic solution and erythromycin ophthalmic ointment, and scheduled an appointment for Weddington at the Wilmer Eye Institute.

On August 14, 2018, at the Wilmer Eye Institute, Dr. Narine Viruni examined Weddington, noted that Weddington had a recurrence of his corneal abrasion, and ordered artificial tears to be applied to Weddington's left eye six times a day and erythromycin ointment to be used at bedtime. Dr. Viruni instructed him to return to Wilmer Eye Institute if the symptoms continued.

On September 18, 2018, Dr. David Clark Gritz at the Johns Hopkins Hospital saw Weddington for recurrent erosion of left cornea. He noted that Weddington appeared to have "refractive error" and a "myopic shift" for an unexplained reason. Med. Records at 92. At the time, Weddington was "very angry" and was "cursing" and "blaming JHU for problems with his eyes." Med. Records at 92. Dr. Gritz advised Weddington to continue to use the artificial-tears

3

lubricating eyedrops regularly, as well as the ointment, and that he would be rechecked in three months.

On October 11, 2018, Dr. Barnes observed that Weddington had had blurry vision for two days but had been noncompliant with his prescribed medication for two days, then referred him again to eye specialists. On October 28, 2018, Weddington was seen by an optometrist, and on November 4, 2018, he was seen by an ophthalmologist.

On January 4, 2019, Weddington was seen at the Wilmer Eye Institute by Dr. Ishrat Ahmed for eye pain, blurred vision, and recurrent erosion of the left cornea. Dr. Ahmed prescribed cyclopentolate eyedrops and erythromycin ophthalmic ointment. Upon Weddington's return to BCDC, Dr. Barnes noted that Weddington had a normal examination and ordered the eye ointment. He received new eyedrops on January 11, 2019.

After Weddington stated in a sick call request on June 22, 2019 that he was seeing things floating in his vision, he was seen by an optometrist and also by Dr. Barnes, who referred him to an ophthalmologist. That examination, on July 23, 2019, had normal results. When Weddington again complained about this condition in August 2019, he was scheduled for another examination by an ophthalmologist in September 2019. On September 3, 2019, Weddington was transferred to another facility.

## II.   Procedural History

On July 23, 2019, Weddington filed the original Complaint in this case naming in PrimeCare and Wilmer Eye Institute as Defendants. He asserted that he received inadequate medical treatment and now sees cloudy dots and black dots and cannot see things close up. After PrimeCare filed a Motion to Dismiss, this Court denied the motion without prejudice as premature,

4

ordered PrimeCare to provide Weddington with the relevant medical records, and granted Weddington leave to file an Amended Complaint.

In his April 20, 2020 Amended Complaint, Weddington added Dr. Barnes, Dr. Viruni, Dr. Gritz, and Dr. Ahmed as Defendants. He now asserts that he received an inadequate response to numerous sick call requests relating to his eye; that Dr. Barnes "always tried to cut corner[s]" as compared to the directions from Wilmer Eye Institute; that in October 2017 and October 2018, Dr. Barnes provided only ointment or a fitting for glasses rather than the treatment recommended by Wilmer Eye Institute; and that in August 2019 he was given the "wrong treatment" by an ophthalmologist after he was told that he could not use the regular ointment or eyedrops, which resulted in an emergency visit to the Wilmer Eye Institute. Am. Compl. at 2, ECF No. 20. Weddington also complains about the treatment he received at the Wilmer Eye Institute, claiming that technicians there were allowed "to play in my eye" and that after one visit his eye remained dilated for three months. *Id.* As relief, Weddington seeks proper treatment and monetary damages of $500,000.

In an affidavit submitted with the Motion, Dr. Barnes, who treated Weddington between September 16, 2017 and September 3, 2019, asserts that Weddington's treatment plan was appropriate and within practice norms, and that he was properly referred when necessary to optometry, ophthalmology, the Wilmer Eye Institute, and the Johns Hopkins Emergency Department.

## DISCUSSION

### I. Non-Dispositive Motions

The PrimeCare Defendants have filed a Motion to Seal Weddington's medical records, submitted as Exhibit A to their Motion to Dismiss, because they contain confidential, personal information. That Motion will be granted.

The PrimeCare Defendants have also filed a Motion to Strike Plaintiff's Surreply as unauthorized by Local Rule 105. After the briefing on the Motion to Dismiss was completed, Weddington filed narrative entitled "Affidavits" that, in substance, is a surreply brief in response to the reply brief. Because the PrimeCare Defendants did not assert new arguments in the reply brief, there was no need for a surreply. Accordingly, the Motion to Strike will be granted.

### II. Motion to Dismiss or, in the Alternative, Motion for Summary Judgment

The PrimeCare Defendants seek dismissal or summary judgment on the grounds that Weddington failed to exhaust administrative remedies; the Amended Complaint fails to state a viable basis for PrimeCare to be held liable under 42 U.S.C. § 1983; and the factual record establishes that Dr. Barnes did not provide constitutionally inadequate treatment for Weddington's eye condition.

#### A. Legal Standards

Defendants seek dismissal under Federal Rule of Civil Procedure 12(b)(6) or summary judgment under Rule 56. To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the

factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Typically, when deciding a motion to dismiss under Rule 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint." *Sec'y of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Rule 12(d) requires courts to treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment; and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted).

Here, the notice requirement has been satisfied by the title of the PrimeCare Defendants' Motion. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d), or an equivalent document, explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d); *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244-45 (4th Cir. 2002). Here, the Court previously directed Defendants to provide Weddington with copies of the relevant medical records, and he has not filed a Rule 56(d) affidavit or otherwise persuasively argued for additional discovery in order to address the Motion. The Court therefore will construe

the PrimeCare Defendants' Motion as a motion for summary judgment for purposes of those arguments that require consideration of the submitted evidence.

Under Rule 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, "with all justifiable inferences" drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

### B. Medical Malpractice

To the extent that Weddington has asserted that the allegedly inadequate medical care constituted negligence and medical malpractice, that claim is subject to dismissal for failure to exhaust administrative remedies. Under Maryland law, a negligence claim based on medical care, may be asserted only if the plaintiff can demonstrate exhaustion of the administrative requirement of first presenting the claim to the Maryland Health Care Alternative Dispute Resolution Office. *See* Md. Code Ann., Cts. & Jud. Proc. §§ 3-2A-10 (West 2013); *Wilcox v. Orellano*, 115 A.3d 621, 625 (Md. 2015); *Rowland v. Patterson*, 882 F.2d 97, 99 (4th Cir. 1989) (holding that this requirement applies to medical malpractice claims filed in state or federal court). Here, Weddington has not claimed or established that he satisfied this requirement as to any Defendant.

*See* Md. Code Ann., Cts. & Jud. Proc. § 3-2A-02 (West 2013). Accordingly, any negligence or medical malpractice claim must be dismissed.

### C. Constitutional Claims

As for Weddington's constitutional claims, for convicted prisoners, the Eighth Amendment's prohibition on cruel and unusual punishment protects them from "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (citations omitted). In order to state an Eighth Amendment claim arising from inadequate medical care, a prisoner must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). For pretrial detainees, the Due Process Clause of the Fourteenth Amendment protects their right to receive adequate medical care. *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (stating that "the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, mandates the provision of medical care" to pretrial detainees "who require it" (citation omitted)). The United States Court of Appeals for the Fourth Circuit, while recognizing that a pretrial detainee's protections under the Constitution could arguably be "greater" than those afforded to convicted prisoners, has nevertheless adopted the deliberate indifference standard for claims by pretrial detainees of inadequate medical care. *Hill v. Nicodemus*, 979 F.2d 987, 991-92 (4th Cir. 1992) ("[P]rison officials violate detainee's rights to due process when they are deliberately indifferent to serious medical needs." (citations omitted)); *see also Young v. City of Mount Rainier*, 238 F.3d 567, 575 (4th Cir. 2001); *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir. 1992). Although the United States Supreme Court has since called into question the equivalence between the standards applied to claims by pretrial detainees and those applied to claims by post-conviction inmates in the context of claims of excessive force, *see Kingsley v. Hendrickson*, 135 S. Ct. 2466,

2472-73 (2015), this Court remains bound by Fourth Circuit precedent to apply the traditional deliberate indifference standard adopted in *Hill*.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure that the needed care was available. *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citation omitted).

As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* (citations omitted). "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* Thus, "[d]eliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (citations and internal alterations omitted). Under this standard, a mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Id.* Moreover, even if the requisite subjective knowledge is established, an official may avoid liability if the official "responded reasonably to

10

the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

Weddington's claim against PrimeCare, the contractual medical care provider for BCDC, as well as the claim against Wilmer Eye Institute, are necessarily premised on a theory of vicarious liability for the acts of their personnel. Vicarious liability, or *respondeat superior*, does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). As relevant here, a private corporation providing health care to prisoners such as PrimeCare may be liable under § 1983 only if it has a custom or policy of depriving individuals of their federal rights, such as one of deliberate indifference to a serious medical need. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999); *Clark v. Md. Dep't of Public Safety and Corr. Servs.*, 316 F. App'x 279, 282 (4th Cir. 2009). Weddington has not alleged facts sufficient to support a finding of such an unconstitutional custom or policy by either PrimeCare or Wilmer Eye Institute. The claim against PrimeCare will therefore be dismissed.

As for Dr. Barnes, although Weddington has alleged that Dr. Barnes attempted to "cut corner[s]" with the treatment of his eye, Am. Compl. at 2, and did not always address complaints, including in August 2019, the submitted medical records establish that Weddington received ongoing and regular medical attention for his eye condition, including examinations by nurse practitioners, Dr. Barnes and other BCDC physicians, and ophthalmologists at both BCDC and the Wilmer Eye Institute. The record does not support the conclusion that his medical needs were ignored or left unaddressed to the point of supporting a claim of deliberate indifference to a serious medical need. He also received continual treatment, primarily in the form of prescribed eyedrops and ointment, that was a reasonable response to his condition. *See* Barnes Aff. ¶ 13, Mot. Dismiss Ex. B, ECF No. 22-3; *see Farmer*, 511 U.S. at 844. To the extent that Weddington has claimed

that the prescribed medications and course of treatment were ineffective, his disagreement with the care provided is insufficient to support a constitutional claim. *See Scinto*, 841 F.3d at 225. His claim that one ophthalmologist gave him the wrong medication, in the context of the ongoing medical treatment, would support, at most, a medical malpractice claim, not deliberate indifference. *See Jackson*, 775 F.3d at 178 (finding no viable Eighth Amendment claim even where a prison treatment decision was "mistaken, even gravely so"). Accordingly, the Court finds no genuine issue of material fact on the question whether Dr. Barnes, or any other Defendant, acted with deliberate indifference to a serious medical need and will grant summary judgment in favor of the PrimeCare Defendants.

## III. Remaining Defendants

Although the remaining Defendants have not been served, the Court must screen the Amended Complaint and dismiss it if it fails to state a plausible claim for relief. *See* 28 U.S.C. §§1915(e)(2), 1915A(b) (2018). For the reasons stated above, the Court finds that the Amended Complaint does not state a plausible claim for relief against these Defendants because (1) any medical malpractice claim fails because administrative remedies have not been exhausted; (2) there are insufficient allegations to support a claim of an unconstitutional custom or policy on the part of Wilmer Eye Institute; and there are no specific allegations against the three doctors. The claims against the remaining Defendants will therefore be dismissed.

## CONCLUSION

For the foregoing reasons, the Motion to Seal and the Motion to Strike will be GRANTED. The PrimeCare Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment will be GRANTED. The claims against the remaining Defendants will be DISMISSED for failure to state a claim. A separate Order shall issue.

Date: January 14, 2021

/s/ THEODORE D. CHUANG
United States District Judge